UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
BIONOVATE TECHNOLOGIES CORP.

       Plaintiff,     __ Cv. ____ (  )

  -against-

                **COMPLAINT**

OTC MARKETS GROUP, INC

                **JURY TRIAL DEMANDED**

       Defendant.
---------------------------------------------------------------X

  Plaintiff Bionovate Technologies Corp. (collectively "Bionovate" or "Plaintiff"), by and through its attorneys, The Roth Law Firm PLLC, hereby submits this Complaint against Defendant OTC Markets Group, Inc. ("OTC" or "Defendant").

## PARTIES

  1.  Bionovate is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Nevada.

  2.  OTC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 304 Hudson Street, New York, New York, 10013.

## SUBJECT MATTER JURISDICTION, VENUE AND LEGAL FEES

  3.  Jurisdiction is appropriately before this Court as Plaintiff is a corporation with its principal place of business in the State of Nevada, and Defendant is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the City and State of New York. *See* 28 U.S.C. § 1332.

  4.  Venue is proper in this District as a substantial part of the events or omissions giving rise to the claim occurred in the County of New York, State of New York.

**UNDERLYING FACTS**

5. Bionovate was founded in 2010 and now strategically plans to invest in start-ups in Europe in the health and life care sector and focus its investments strategy towards on-demand healthcare services. In addition, Bionovate focuses on the marketing of patents and licenses which bring healthcare and lifestyle diagnostics to the smartphone.

6. Bionovate contributes both capital and management expertise to its portfolio companies with the objective of directing strategic, operational and financial improvements, typically through initiatives that drive growth, margin improvement and asset efficiency.

7. The OTC maintains a financial marketplace that provides price and liquidity information for companies whose securities are traded "over-the-counter," an industry phrase that denotes securities bought and sold directly between parties without the supervision or intervention of a national securities exchange.

8. The OTC organizes securities traded over its platform into three separate submarkets, which denote the risk associated with each security: OTCQX, OTCQD, and OTC Pink (collectively, the "OTC Marketplace"). Each company with a security traded on the OTC Marketplace is given a company profile where information is provided to investors, including corporate addresses, officers, directors, biographical information, financial information, and stock quotes and prices (an "OTC Profile").

9. The OTC defines its Pink Sheets as the most risky market-it has no financial standards or reporting requirements. Companies trading on the Pink market are not required to be
registered with the SEC. Pink market securities are often associated with shell corporations thathave little or no assets, operations, or activity. Many securities traded on the Pink market

trade below $0.01 per share, lack up to date financial reporting, or are otherwise objectively risky investments.

10. The OTC also designates some companies with a caveat emptor, or a skull and crossbones designation. The caveat emptor appears on the securities OTC Profile and is meant to warn investors that a security is especially risky. Individuals who click on the caveat emptor are provided the following information:

> Buyer Beware. There is a public interest concern associated with the company, which may include a spam campaign, questionable stock promotion, known investigation of fraudulent activity committed by the company or insiders, regulatory suspensions, or disruptive corporate actions.

11. The caveat emptor policy states that it may apply a caveat emptor to a company's OTC Profile when Defendant "becomes aware" of a public interest concern. This same policy notes that Defendant <u>will</u> remove the caveat emptor under the following circumstances: (1) the company meets the qualifications for "Pink Current Information," i.e. is update on financial disclosures; (2) the company has verified the information on its OTC Profile, and (3) the company "demonstrates that there is no longer a public interest concern." The OTC's policy indicates it does not remove the caveat emptor for thirty days after posting the same.

12. In or about May 2019, OTC Surveillance Department applied the Caveat Emptor security[1] tag ("CE tag") to Bionovate securities due to "public interest concerns." Upon

---

[1] Caveat Emptor security is a designation the OTC places on a security after a determination was made surrounding the company that there might be a potential risk to investors which include stock promotion, know investigation of fraudulent activity committed by the company or insiders, regulatory suspensions, or disruptive corporate actions, among other things.

information and belief, the CE Tag was placed on Bionovate because Marc Applbaum, who was a director and officer, was apparently deemed a "bad actor."

13. On September 28, 2020, Applbaum resigned as a director and officer of Bionovate.

14. Subsequently, on September 28, 2020, Aleksander Vucak ("Vucak") was appointed as a director to replace Applbaum.  Also, Vucak was appointed President, Chief Executive Officer ("CEO"), Chief Financial Officer, Secretary and Treasurer of Bionovate.

15. Vucak acquired a corresponding majority of Bionovate shares – 91 percent – via the Switzerland-incorporated holding company Human Data AG.  Vucak took over the majority of the company in October 2020 through a share swap[2] and a published corresponding Share Exchange Agreement.

16. Vucak appointment was in conjunction with a plan to reposition the company as an investment holding company.

17. With a strong emphasis on digital transformation, the goal was to build an FDA-approved ecosystem of medical devices, biosensors and mobile applications to turn tests that were previously done in physical labs into tests that can be carried through by anyone with a mobile device.

18. For instance, it was planned that Bionovate would acquire a strategic stake of 25 percent in Digital Diagnostic AG ("Digid")[3] of Mainz, Germany. This included several prominent business individuals and scientists joining the Board of Directors.

---

[2] Existing shareholders transferred their shares to Vucak so that corresponding majority relationships exist and operational decisions could be made.

[3] Digid is a medical-tech start-up founded in 2019 and realigned in 2021. Digid is developing a digital system – based on more than ten years of university research – that makes real-time diagnostics possible everywhere.

19. To substantially increase free float,[4] Bionovate announced the issuance of up to 2 million new shares. The Board of Directors approved a price range to sell shares at $4 and $8 apiece to bolster Bionovate's available resources to finance the acquisitions of three start-ups in the health and life care sector.[5]

20. To strengthen the shareholder structure and as a sign of confidence in Bionovate's business plan, Vucak cancelled and returned 13,820,000 shares of the company's common stock in early December 2020.[6] The stock transactions were also disclosed shortly thereafter in reports filed with the Security Exchange Commission ("SEC").

21. It was presumed that once a new setup of management, board, operations, financing, bylaws, and implementation of compliance and governance, then removal of the CE tag by OTC would only by a formality.

22. OTC's CE tag removal process, as disclosed on their website, is as follows:

> [OTC] may review a Caveat Emptor designation upon request by the company and may determine, in its sole discretion, to remove the designation. The Caveat Emptor designation is typically not removed within the first 30 days of designation. To be eligible for a review, a company must meet the qualifications for Pink Current Information[7], have a verified the information on its company profile www.otcmarkets.com, and demonstrate to [OTC] that there is no longer a public interest concern.

---

[4] Free float refers to the shares of a company that can be publicly traded and are not restricted (i.e., held by insiders). In other words, the term is used to describe the number of shares that is available to the public for trading in the secondary market. Corporate Finance Institute, https://corporatefinanceinstitute.com/resources/knowledge/trading-investing/free-float/ (last visited Nov. 8, 2021).

[5] In fact, in December 2020, Bionovate management identified a shortlist of 10 targets which have the potential of disrupting their respective industry.

[6] This reduced the number of issued and outstanding Bionovate common shares to 45,903,598.

[7] OTC's Pink Current Information is based on the timeliness and sufficiency of a company's public disclosure, such as a company's SEC Reporting. *See* OTC Markets, *Information for Pink Companies*, https://www.otcmarkets.com/corporate-services/information-for-pink-companies (last visited Nov. 22, 2021).

OTC Markets, *Caveat Emptor Policy*, https://www.otcmarkets.com/learn/caveat-emptor (last visited Nov. 22, 2021).

23. Subsequently – in accordance with OTC's Caveat Emptor policy – on or about October 8, 2020, Vucak emailed a completed OTCIQ Order Form, Background Check Authorization Form and Personal Information Form to OTC in an effort to update Bionovate OTC profile. Vucak explained in detail his appoint as CEO, plans to reposition the company, and next steps to work on uplisting Bionovate to OTCQB and eventually OTCQX.

24. After receipt of the OTCIQ Order Form, OTC requested additional documents in order to begin processing.

25. On or about November 28, 2020, Vucak sought services from George Sharp[8] ("Sharp") to remove the CE tag.

26. On or about December 14, 2020, OTC provided Vucak an OTCIQ Agreement via docusign as a final step for processing the OTCIQ Order Form. Vucak signed and returned the OTCIQ Agreement.

27. On December 17, 2020, Sharp wrote OTC to inform that Bionovate is fully compliant with its filing requirements with the SEC as a reporting issuer and has provided OTCM with all requested documentation. Sharp opined that Bionovate is worthy of having the CE tag removed, and he would inform OTCM if his opinion changed.

28. Throughout December 2020 and January 2021, Vucak emailed Sharp for updates from OTC regarding the CE tag removal.

---

[8] Sharp is a consultant with 20 years of experience providing services to regulators, attorneys and publicly traded companies seeking to protect investors.

29. On or about January 22, 2021, Sharp emailed Vucak that OTC were prepared to remove the CE tag once they reviewed Bionovate's 10-Q for the period ending on December 31, 2021, and asked Vucak when it would be filed. That 10-Q was filed.

30. On or about February 9, 2021, Sharped emailed Vucak that OTC requested a copy of Bionovate convertible notes issued on the following dates:

- June 30, 2020
- March 31, 2020
- December 31, 2019
- September 30, 2019
- June 30, 2019
- March 31, 2019

31. In response, Vucak provided the referenced convertible notes and stated his frustration since these documents could have been submitted months ago. **Exhibit G**

32. On or about February 18, 2021, Sharp emailed Vucak with the following additional requests from OTC:

- Reasons for each convertible note
- Any planned corporate actions such as reverse splits or name changes
- If any regulatory bodies, including but not limited to the SEC and FINRA, have requested information from or contacted the Company since January 1, 2019.

33. In response, Vucak again provided responses to Sharp for OTC's additional requests.

34. Since then, OTC has failed to provide the status of removing the CE tag and no other corrective action necessary for removal of the CE tag.

35. The Company repeatedly requested information from the OTC regarding what information the Company needed to provide to cure any items to remove the CE tag and the OTC has gone radio silent.

36. Because the caveat emptor policy places the burden on Bionovate to remedy any alleged "public interest concern," and the OTC has refused to identify what the alleged public interest concern is, Bionovate is paralyzed and cannot do business.

37. The caveat emptor on the Company's OTC Profile, without cause or justification, has extended for close to two years, rather than the typical thirty days as outlined in the OTC's caveat emptor policy. During that time, the Company and its shareholders have been has irreparably harmed.

38. The OTC's continued display of the caveat emptor on Bionovate's profile has deflated the Company's stock price and trading volume.

39. Even counsel for Bionovate attempted to contact the OTC, informing it that it would sue if it had to and the OTC literally ignored any outreach by Bionovate counsel.

### AS AND FOR A FIRST CLAIM FOR RELIEF
### FOR BREACH OF CONTRACT

40. Bionovate repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

41. Bionovate and Defendant entered into oral and written contracts, including, but not limited to, (1) agreements regarding the removal of the CE, and (2) agreements under which Bionovate OTC profile would be updated in order to be uplisted to OTCQB.

42. Bionovate has complied with all aspects of its contractual relationships with Defendant, including providing requested information and/or documents.

43. Defendant has breached the contractual relationships in a number of ways, including, not limited to, not removing the CE tag on Bionovate's OTC Profile without justification or explanation, and acting in a manner that prohibits Bionovate from complying with Defendant's CE policy,

44. As a result, Bionovate has been or is about to be injured in an amount to be determined at trial, which equals the revenues and equity Bionovate would have received if the CE tag was not on their OTC profile.

## AS AND FOR A SECOND CLAIM
## FOR NEGLIGENT MISREPRESENTATION

45. Bionovate repeats and realleges the above paragraphs as though fully set forth herein.

46. Defendant owed a duty to Bionovate and did not use reasonable care in supplying information to Bionovate regarding the status of the CE tag appearing on Bionovate's PTC Profile. Instead, Defendant regularly insisted that certain acts, such as a copy of Bionovate convertible notes issued on specific dates, would resolve the alleged public concern.

47. These statements were misrepresentations made to Bionovate, on the which Bionovate justifiably relied.

48. As a result of these representations, and the reliance placed on those misrepresentation, Bionovate has been or is about to be injured in an amount to be determined at trial, which equals the revenues and equity Bionovate would have received if the CE tag was not on their OTC profile.

## AS AND FOR A THIRD CLAIM FOR TORTIOUS
## INTERFERENCE WITH PROSPECTIVE ECONOMIC
## ADVANTAGE

49. Bionovate repeats and realleges the above paragraphs as though fully set forth herein.

50. With the CE tag remaining on Bionovate's OTC Profile, Defendant has caused Bionovate's stock price and demand to fall and discourages other potential acquisitions of start-up companies.

51. Defendant refuses to remove the CE tag without justification or explanation and has refused to provide any information regarding the alleged public concern. Further, Defendant stopped providing Bionovate with corrective actions to remove the CE tag. Subsequently, Bionovate has minimal ability to raise funds and sell stock. Most significantly, the CE tag suggests that Bionovate is extremely risky, when in fact, it is fully transparent through its reporting with the SEC.

52. But for Defendant's conduct, Bionovate would be able to effectively sell its shares without interference and at a higher market value than currently available.

53. As a result, Bionovate has been or is about to be injured in an amount to be determined at trial, which equals the revenues and equity Bionovate would have received if the CE tag was not on their OTC profile.

### AS AND FOR A FOURTH CLAIM FOR BREACH OF THE OBLIGATION OF GOOD FAITH AND FAIR DEALING

54. Bionovate repeats and realleges the above paragraphs as though fully set forth herein.

55. Inherent in every contractual relationship is an obligation of good faith and fair dealing.

56. Bionovate has fully complied with Defendant's qualifications under the Caveat Emptor Policy, but for the actions or inactions of Defendant, made an effort to comply with all qualifications under the Caveat Emptor Policy.

57. The Caveat Emptor Policy contains an implied covenant of good faith and fair dealing which obligates OTC to refrain from taking any action or inaction which would deprive Bionovate of the benefits of the Caveat Emptor Policy or which would cause undue hardship or harm to Bionovate.

58. Defendant breached the implied covenant of good faith and fair dealing contained in the Caveat Emptor Policy by, among other things, interfering with, and failing to cooperate with Bionovate in the performance of its duties, and in the exercise of its rights under the Caveat Emptor Policy.

59. By so acting, or failing to act, Defendant has conducted itself with reckless and negligent disregard for Bionovate's rights under the Caveat Emptor Policy.

60. As a result, Bionovate has been or is about to be injured in an amount to be determined at trial, which equals the revenues and equity Bionovate would have received if the CE tag was not on their OTC profile.

DATED:   New York, New York
         December 2, 2021

THE ROTH LAW FIRM, PLLC

By:_____/s/_____
         Richard A. Roth
295 Madison Avenue, 22nd Fl.
New York, New York 10017
Tel: 212-542-8882
Fax: 212-542-8883
*Attorneys for Plaintiff*